**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Marlyce K. Kemnitz, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhardt, | ) | Case No. 1:05-cv-125 |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Plaintiff, Marlyce K. Kemnitz ("Kemnitz"), seeks judicial review of the Social Security Commissioner's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§401-433. Chief Judge Daniel L. Hovland has referred this matter to the undersigned for preliminary consideration.

I.     **BACKGROUND**

  A.     **Procedural History**

Kemnitz protectively filed an application for disability insurance benefits on November 5, 2003, alleging that she had been disabled since December 15, 1998. (Tr. 51-53). Her application was denied initially and upon reconsideration, prompting her to request a hearing before an administrative law judge ("ALJ"). (Tr. 21, 32-41). Pursuant to her request, ALJ Warren H. Albrecht, Jr. conducted a hearing on March 3, 2005. (Tr. 230-261). On August 16, 2005, he issued a decision wherein he concluded that she was not entitled to disability insurance benefits. (Tr. 12-20).

1

On August 31, 1998, Kemnitz requested a review of the ALJ findings with the Appeals Council on the grounds that he failed to take her chiropractic records into consideration when rendering his decision. (Tr. 7). On November 10, 2005, the Appeals Council denied her request for review and adopted the ALJ's findings as the Commissioner's final decision. (Tr. 4). Thereafter, on December 2, 2005, Kenmitz filed a complaint with this court seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

The Commissioner filed a Motion for Summary Judgment on March 30, 2006. See Docket No. 7. Kemnitz filed a reply in opposition to the motion on May 2, 2006. See Docket No. 10.

**B.     Factual Evidence**

Kemnitz was born on December 13, 1956, and was forty-eight years old at the time of her administrative hearing before the ALJ. (Tr. 18, 51). She is married and lives with her husband in Steele, North Dakota. (Tr. 51, 238). She has a high school education. (Tr. 249). She has at various times worked as a cashier, stocker, a meat cutter at a meat market, a laundry and feeding assistant at a nursing home, a cashier and stocker at a drug store, and most recently as a custodian at a clinic. (Tr. 58). She has not engaged in any substantial gainful activity since December 15, 1998, the alleged onset date of her disability. (Tr. 13).

Kemnitz quit working in 1998 after she began experiencing pain in her back and feet. (Tr. 93, 233-34). She has since experienced numbness and weakness in her lower extremities, leg pains that she attributes to muscle spasms, and tail bone pain. (Tr. 93, 234-37, 245). On a scale of one-to-ten (with ten being the most severe), she reports that her pain fluctuates between a two and an eight. (Tr. 93). She describes her pain as sometimes sharp while at other times more of a constant dull ache, adding that her feet sometimes feel as if they are on fire. (Tr. 93, 98). For relief, she takes an

2

occasional hot bath or shower.  (Tr. 93, 96).  She also takes eight-hundred milligrams of Ibuprofen

four times a day, which reportedly affords her slight pain relief but gives her stomach problems.  (Tr.

93, 110).  She apparently tried the prescription drugs Bextra and Ultracet but discontinued their use

after discovering blood in her stool.  (Tr. 93).

In addition to her pain complaints, Kemnitz reports that she has suffered from poor vision

(she had a lesion on her optic nerve), has some difficulty walking, has balance issues and on

occasion has to use a cane, suffers from what she describes as a "toe drop," has two bulging disks

in her back, and often feels tired.  (Tr. 93-94, 235-38, 244).  She has been diagnosed with multiple

sclerosis, depression, anxiety, and high blood pressure.  For these maladies, she has at various time

been prescribed Opaxone, Zoloft, Trium/HTZ (triamterene/hydrochlorothiazide), and Baclofen.  (Tr.

110-111, 113).  She supplements these prescription medications with glucosamine and chondroiton,

calcium supplements, and multiple vitamins.  (Tr. 110).

Kemnitz states that her condition has hampered her ability to perform what were once routine

physical activities.  (Tr. 233-39).  She reports she no longer does yard work, can no longer climb

ladders, has trouble with steps, cannot walk as much as she would like, cannot stretch, and has

difficulty lifting or carrying.  (Tr. 94-97).  Likewise, at her administrative hearing, she testified that

she is no longer able to engage in exercise on a regular basis.  (Tr. 241).  She nevertheless remains

capable of caring for her own personal needs.  (Tr. 100).  She also remains capable of driving and

can ride in a car for an extended period of time (although not entirely without some discomfort) as

evidenced by a trip she took in the summer of 2004 with her husband to Thunderbay, Ontario,

Canada.  (Tr. 238-39).  However, she reports there are instances when her condition flairs up and

that she is just too weak to drive.  (Tr. 101).

Kemnitz has no hobbies in which she is actively engaged. (Tr. 239). Although she considers crocheting to be her hobby, she has not crocheted in over a year. (Tr. 239). She is not very active socially. (Tr. 239).

### C.    Medical Records

Kemnitz sought chiropractic treatment between January 1999 and February 2004. She first presented to Dr. Sherri Ten Broek on January 4, 1999, complaining of lower back pain. (Tr. 186). Concluding that she suffered from lumbar and pelvis segmental dysfunction with fascitis, Dr. Ten Broek performed manual adjustments on the LT C2 area, the PT C4-5 area, and the LT L4-5 area. (Tr. 186). In addition, Dr. Ten Broek placed EMS on the L4-S1 region for ten minutes. (Tr. 186).

Kemnitz  returned to Dr. Ten Broek for regular treatments over the following two months. (Tr. 184-186.). Dr. Ten Broek did not observe any appreciable change in Kemnitz's condition during her next four visits (Tr. 184. However, examination notes dated February 11 and February 18, 1999, indicated that Kemnitz's pain had relented to a certain extent and that she was "able to do a lot more things." (Tr. 184).

Kemnitz returned to Dr. Ten Broek on April 5, 1999, with complaints of pain in her right leg and lower back. (Tr. 183). According to the examination report, Dr. Ten Broek performed some manual adjustments, placed EMS and ice on the L4-S1 region and bilateral glutes for approximately twelve minutes, and instructed Kemnitz to return as needed. (Tr. 183).

Kemnitz returned to Dr. Ten Broek thrice in June 1999, with complaints of knee, shoulder, and lower back pain. (Tr. 182-83). Examination notes dated June 3, 1999, stated that Kemnitz had given some thought about consulting a neurologist about her ongoing back problems. (Tr. 183). Examination notes dated June 17, 1999, stated that Kemnitz had taken a hard fall while cutting down

4

trees in her yard and was again suffering from shoulder and lower back pain. (Tr. 183). Examination notes dated June 24, 1999, stated she was experiencing pain in her right knee in addition to her ongoing back pain. (Tr. 182).

Kemnitz next presented to Dr. Ten Broek on July 29, 1999, reporting slight improvement in her back but complaining of neck pain and headaches. (Tr. 182). She returned regularly over the next five months alternatively complaining of general soreness, numbness and tingling in her lower extremities, headaches, and pains in her back and neck. (Tr. 178-182). For example, she presented on August 2, 1999, reporting that she had tripped while helping her daughter move and was experiencing lower back pain. (Tr. 182). She presented on August 30, 1999, reporting that she had slipped on some wet grass, felt a twinge in her side, and had subsequently developed a sharp pain in her leg. (Tr. 181). She presented ten more times between September 9, 1999, and December 30, 1999, complaining of headaches, pain in her left shoulder, back pain, and dizziness. (Tr. 180). Each time she received a manual adjustment and was directed to return as needed. (Tr. 178-182).

Kemnitz continued to present regularly to Dr. Ten Broek the following year. (Tr. 172-182). Each time she received a manual adjustment and was directed to return as necessary. (Tr. 172-182). In addition, on December 21, 2000, EMS was placed over the L4-SI region for twelve minutes on tetanize. (Tr. 173). During a visit on December 22, 2000, she was advised by Dr. Ten Broek to consult a neurologist. (Tr. 173). On December 26, 2000, she was advised by another chiropractor, Dr. Wade Darr, that she should go to an emergency room and request a neurological evaluation. (Tr. 172).

Kemnitz heeded the advice of Dr. Darr and made an appointment with a neurologist (which she later canceled). (Tr. 170, 172). In the interim, she returned to Dr. Ten Broek (and on occasion

5

to Drs. Amanda Messer, Angela Ness, and Wade Darr) on a regular basis for additional chiropractic treatment. (Tr.135-172). The record reveals that between 2001 and 2003 she sought out chiropractic treatment two or sometimes even three times per month, alternatively complaining of intermittent pain in her back and legs, numbness and weakness in her lower extremities, and/or headaches. (Tr. 151-172). The most common assessment expressed by Kemnitz's chiropractors in their notes of these visits was that she exhibited either cervical, thoracic, or lumbar segmental dysfunction with fasciitis and neuritis. (Tr. 135-186). She continued to receive manual adjustments and was told to return as need. (Tr. 135-172). Later, she was also told to home stretch and to use home TENS units. (162, 170). On occasion she had EMS applied to her back and was told to use ice. (Tr. 138-39, 142, 146-47, 150, 152, 155-58). It appears that she continued to receive treatment from Dr. Ten Broek through May 2004. (Tr. 135-36, 206-08).

Kemnitz presented to Dr. Faiz E. Niaz, a local neurologist, on May 5, 2003, for a consultation regarding her long-standing history of back pain. (Tr. 114). Dr. Niaz noted in his consultative report that the chiropractic treatment Kemnitz had been receiving since 1999 had relieved some of her symptoms and that she had been doing reasonably well until she slipped and fell on some ice in September 2002. (Tr. 114). He also observed that Kemnitz was suffering from joint pain, muscle aches, headaches, and dizziness, but added that her condition was otherwise unremarkable. (Tr. 114). His general impression was that Kemnitz had possible lower back pain but did not exhibit evidence of any radicular process. (Tr. 115). He ordered an MRI of the lumbrosacral spine and started her on Bextra. (Tr. 115).

Kemnitz underwent an MRI on May 12, 2003. (Tr. 113). The MRI results revealed there were very mild changes at various levels, that is, moderate degenerative changes at L4-5 as well as

6

slight disc bulging at L5-S1, but did not suggest any significant degenerative disk disease. (Tr. 113, 117). Noting that Kemnitz had reported that she was doing better overall despite some numbness in her lower extremities, Dr. Niaz recommended that, pending a future EMG/nerve conduction study, she receive physical therapy for her lower back and lower extremities. He also took her off Bextra because of complaints of itching and switched her to Ultracet. (Tr. 113).

Kemnitz reported to Dr. James B. Ragland in June 3, 2003, with complaints of numbness in her lower extremities. (Tr. 201-02). Dr. Ragland observed no signs of peripheral neuropathy in the lower extremities or evidence of any lumbo-sacral radiculopathy in L5-S1 root bilaterally. (Tr. 202-04). Recognizing Kemnitz's growing concern that she had developed MS, he recommended that she undergo a brain MRI. (Tr. 202-03). In addition, he recommended a regimen of physical therapy, an exercise program, and continued chiropractic treatment. (Tr. 202-03).

Kemnitz underwent an MRI of her head on June 23, 2003. (Tr. 205). According to the radiologists report, the impression was that (1) there are a few tiny focal regions of increased signal in the deep white matter, non-specific in nature, and (2) mild bilateral maxillary sinusitis. (Tr. 205).

Kemnitz returned to Dr. Raglund on June 25, 2003. (Tr. 199). Dr. Raglund noted that the MRI showed no evidence of any demylinating regions, tumors, strokes, congenital abnormalities, or cysts. (Tr. 199). Suggesting that the bulging disc at the L4-L5 could be causing her symptomology, he recommended that she receive physical therapy twice a week in lieu of any medication. (Tr. 200).

Dr. M.J.E. Johnson assessed Kemnitz's functional capacity in late December 2003 and reached the following conclusions. (Tr. 187-194). Kemnitz could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an

eight-hour workday, sit for a total of about six hours in an eight-hour workday, and had an unlimited ability to push and/or pull.  (Tr. 188).  She exhibited frequent postural limitations but no visual, manipulative, communicative, or environmental limitations.  (Tr. 189-90).

Kemnitz returned to Dr. Raglund on April 15, 2004, complaining of significant weakness, tingling and numbness in her lower extremities, burning sensations in her feet when standing, gait imbalance, and lower back pain.  (Tr. 195).  Dr. Raglund observed that Kemnitz had some weakness in her right leg, which he graded a 4/5, that her left leg appeared to be okay, that she had diminished reflexes in her knees and ankles, that her sensation to pin prick had diminished up to her ankles bilaterally, that she was experiencing significant tightness and muscle spasms in the lumbar spine, and that she used a cane when walking on flat surfaces. (Tr. 196).  He performed an EMG and nerve condition study, after which he opined that, from a medical point of view, there had been a paucity of findings in terms of neurodiagnostic evaluations, that many of the muscoskeletal syndromes did not have any objective findings, and that he had to rely on her descriptions and medical history.  (Tr. 196).  He concluded that Kemnitz suffered from severe plantar fasciitis but that her pain could not be evaluated neurodiagnostically.  (Tr. 198).  Finding her pain complaints credible, he stated that, in his opinion, Kemnitz was incapacitated a great deal by her condition and that she fully deserved compensation from Social Security Disability.  (Tr. 196). He stated he would treat Kemnitz with anti-inflammatory medications, except that she has gastritis and noted this was a big handicap.  He also recommended that she resume her physical therapy.  (Tr. 196).

Kemnitz reported to the emergency room on November 2004, complaining that her vision in her right eye had been deteriorating over the past week to week and a half.  (Tr. 215).  She

underwent another MRI, the results of which revealed the existence of lesions above the lateral ventricles in the periventricular deep white matter at the upper parietal lobes. (Tr. 220).

On November 27, 2004, Kemnitz presented to Dr. Marco A. Benitez, who, in his examination report, observed that she had denied any pain, was alert, active, and well oriented and had a normal gait as well as a normal range of motion of her spine. (Tr. 216-219). He also observed that her left eye appeared normal but that the visual acuity in her right eye was 20/200. (Tr. 217). He graded her muscle strength a five out of five. (Tr. 218). Reviewing the MRI of her brain, he noted the existence of small ischemic, demyelinating lesions in the subcortical white matter of both cerebral hemispheres. (Tr. 218). His impression was that she seemed to be affected by MS given the evolution of her symptoms with intermittent neurological transient deficits. (Tr. 218).

Kemnitz returned to Dr. Raglund on February 16, 2005, for a disability evaluation. (Tr. 213-214). According to Dr. Ragland's report, her upper extremity strength was 4/5, her lower extremity strength was 4+/5, and that her sensation to pin prick, vibration, and position were grossly intact. (Tr. 213-14). His general impression was that she did not feel she was able to handle any of the work load or lifting and carrying, that she appeared to have plantar fasciitis, and that she suffered from chronic fatigue most likely attributable to MS. (Tr. 214). He added that the vision in her left eye had returned and that "[s]he appears to have more of a muskuloskeletal syndrome because objectively, neurodiagnoistically, I did not find any abnormalities at [sic] documented before." (Tr. 214).

When assessing Kemnitz's ability to perform work related activities (from the alleged onset date through June 30, 2004), Dr. Ragland concluded that she could occasionally lift less then ten

pounds, could stand and/or walk for less than two hours in an eight-hour workday, could sit less than two hours in an eight-hour workday, and that her ability to push and/or pull was limited in both her upper and lower extremities.  (Tr. 209-10).  He added that she could only stoop occasionally, had limited vision in her right eye,  and was limited from reaching, handling, and fingering frequently. (Tr. 210-11).   As for environmental limitations, he stated that she had a limited tolerance to temperature extremes, noise, dust, vibration, humidity, hazards, and fumes.  (Tr. 212).

In addition to visiting Dr. Ragland on February 16, 2005, Kemnitz also returned to Dr. Benitez for a follow-up visit regarding her diagnosis of MS.  (Tr. 226).  According to Dr. Benitez's examination notes of this visit, she complained of slight fatigue, muscle spasms, slight  imbalance from time to time, weight gain, and pain in her left foot and back.   (Tr. 226).  She denied any weakness or any other significant problems, however.  (Tr. 226).  Dr. Benitez observed that muscle power was preserved in both upper extremities, that she had some "give way" weakness at the level of the left lower extremity, and that she walked with a little limp but that she had no other significant problems on examination (Tr. 227).  His impression was that her MS was stable and that her examination was quite functional despite her various complaints. (Tr. 227).  He recommended that Kemnitz start taking low doses of Baclofen for her muscle spasms, noting that she could take it immediately before bedtime because of the pain being worse only at night.  (Tr. 227).

Finally, there is mention throughout the medical records that the claimant has a problem with obesity and this was listed as a secondary diagnosis in the state DDS assessment, but was not discussed in any detail in either the assessment or the ALJ's decision.   (Tr. 26-27)

D.    **ALJ Hearing**

The ALJ convened an administrative hearing on March 3, 2006.  Kemnitz appeared personally.  A vocational expert, Warren Haagenson, was also present.  (Tr. 230).

Before taking Kemnitz's testimony, ALJ expressed concern about a matter that had recently come to his attention: that he had not received all of Kemnitz's records from Dr. Benitez.  (Tr. 230-31).  Apparently Kemnitz had these records with her and was able to provide copies to the ALJ.  (Tr. 231).  With this initial matter seemingly resolved, the ALJ proceeded to advise Kemnitz of her right to representation.  (Tr. 231).  Following a brief exchange, Kemnitz elected to proceed *pro se.*

Kemnitz testified that she quit working on account of her back, leg, and foot pain. (Tr. 234). With respect to her present symptoms, she testified that her left leg and foot were very weak, that she suffers from painful muscle spasms, and she has experienced occasional dizzy spells.  (Tr. 236-37, 243).  She also testified that her condition requires her to be conscientious of the shoes she wears (as she has a tendency to trip if she wears shoes that are too heavy) and that she uses a cane on steps or unlevel ground.  (Tr. 236-37).  She added that she wears glasses and can see well enough to get around.  (Tr. 237).

Kemnitz next testified that she drove herself to the hearing, which prompted an inquiry from the ALJ about the last time she had taken a trip by car that exceeded one-hundred miles.  (Tr. 237-38).  In response, she testified to having vacationed in Thunderbay, Ontario, Canada, the previous summer.  (Tr. 237).  However, she added that she was having a lot of problems at the time and that her husband had done all of the driving.  (Tr. 237).

Next, when asked to describe her daily activities, Kemnitz testified that, to occupy her time, she would clean, wash clothes, read books on MS, watch television, e-mail others, or chat online with others suffering from MS.  (Tr. 240, 245-47).  She also testified that her husband typically

drives her into Bismarck on Sundays to "get groceries or whatever . . . ." (Tr. 240). With respect to her ability to engage in regular exercise, she testified that she had stopped walking for exercise the previous March on account of her toe drop. (Tr. 241).

Kemnitz testified that her balance problems precluded her from climbing a ladder and made ascending and descending stairs difficult. (Tr. 244). She also testified that she can not remain seated for very long on account of pain in her tailbone. (Tr. 245). Finally, she expressed doubt about her ability find light, sedentary work that she could perform near her home in Steele.[1]

At the close of Kemnitz's testimony, the ALJ proceeded to summarize the medical evidence along with Kemnitz's subjective pain complaints for the vocational expert, Warren Haagenson. (Tr. 252-54). Next, he asked Haagenson whether there were any jobs in the national economy for a hypothetical person in Kemnitz's physical condition who could perform a narrow range of light work, perhaps lift up to 20 pounds on an occasional basis, was limited to standing for two hours each day during an eight-hour workday, could remain attentive and responsive in a work setting, could carry out normal work assignments at the appropriate exertion level, and found it necessary to change positions from time to time. (Tr. 254-55).

---

[1]When asked whether she could work as an office clerk and handle phones, she was dismissive as indicated by the following exchange:

ALJ:   So, you know, we have to decide based on kind we – we have to decide whether you could perhaps do some sort of sedentary work. Couldn't you be like an office clerk or something like that, or –

CLMT:  What does an office clerk do?

ALJ:   Well, not much.

CLMT:  I don't know.

ALJ:   Physically, not much. Could you handle the phone?

CLMT:  Yeah. Where would I get a job where all they want to do is somebody to sit and answer the phone?

ALJ:   Well, not in Steele.

CLMT:  No, and I'm not driving back and forth to Bismarck every day either . . . .

(Tr. 249).

In response, Haaganson testified that while such an individual would be unable to perform Kemnitz's past relevant work, she could still perform a wide range of unskilled sedentary occupations, such as a food and beverage order clerk (8,000 jobs regionally and 230,000 jobs nationally), a charge account clerk (7,000 jobs regionally and 200,000 jobs nationally), and a small parts and bench-assembly person (3,000 job regionally and 80,000 jobs nationally). (Tr. 255-57).

Kemnitz questioned Haaganson about the job duties of food and beverage order clerks and charge account clerks. (Tr. 257-258). Haaganson responded that food and beverage clerks generally work in either a warehouse or retail setting and take restaurant supply orders. (Tr. 257-58). He also explained that charge account clerks are typically seated, wear headsets, and field calls from persons with questions about their charge accounts. (Tr. 258).

**E.      ALJ Decision**

The ALJ issued his written opinion denying Kemnitz's application for disability insurance benefits on August 16, 2005. (Tr. 12-20). When reviewing the application, he employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520. He quickly dispensed with the first step, acknowledging that Kemnitz had not engaged in any substantial gainful activity since the alleged onset date of her disability. (Tr. 13).

At the second step, the ALJ inquired into whether Kemnitz had a severe impairment. Based upon his review of the records he deemed to be from acceptable medical sources,[2] he determined Kemnitz had not suffered from any medically determinable impairments for the period of December 15, 1998, through April 2004. (Tr. 13-15, 19). However, he added, that as of November 2004,

---

[2] The ALJ disregarded the diagnoses of Kemnitz's treating chiropractors on the grounds chiropractors did not constitute an acceptable medical source for determining an impairment's severity. (Tr. 13).

Kemnitz had a clear diagnosis of early stage MS, a condition he acknowledged constituted a severe impairment. (Tr. 15, 19).

Moving on to the third step of his analysis, the ALJ compared Kemnitz's impairment to the presumptively disabling impairments listed 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 15). In so doing, he determined that Kemnitz did not have an impairment or combination of impairments that arose to listing level severity, explaining that her treating physicians had not reported the necessary clinical, laboratory, or radiographic finding specified in the applicable regulations. (Tr. 15). He also determined that Kemnitz did not satisfy the listings for musculoskeletal complaints and MS, explaining that she did not exhibit disorganization of motor function, had not exhibited any visual or mental impairments lasting at least twelve months, and did not have substantial muscle weakness on repetitive activity. (Tr. 15).

At the fourth step, the ALJ assessed Kemnitz's residual functional capacity, that is her "ability to do sustained work-related physical and mental activities in a work setting on a regular basis." (Tr. 15). Observing that Kemnitz had not required any ongoing treatment or prescription medication for the entire period in question, he discounted Kemnitz's subjective pain complaints on the grounds that her testimony regarding her symptomology and resulting limitations was not entirely credible. (Tr. 15, 19). He also discounted Dr. Ragland's February 16, 2005, assessment of Kemnitz's ability to perform work-related activities, finding that the opinions expressed by Dr. Ragland about the effects of Kemnitz's MS, plantar fasciitis, and chronic fatigue were not entirely credible. (Tr. 16). He believed that Dr. Benitez's examination report dated February 16, 2005, had greater credibility, reasoning that Dr. Benitez had performed a thorough system review and had access to MRI reports whereas Dr. Ragland had not. (Tr. 17).

14

The ALJ afforded great weight to the State agency physician's assessment of Kemnitz's residual functional capacity: that Kemnitz was capable of performing medium work with frequent climbing, balancing, stooping, kneeling, crouching, and/or crawling and that she had no limitations in the area of manipulation, vision, hearing, or environmental.  (Tr. 18).   In his opinion, this assessment was well supported by and consistent with the record as whole.  (Tr. 18). Nevertheless, giving Kemnitz some benefit of the doubt, he concluded that Kemnitz had the residual functional capacity to

> perform a full range of sedentary work-related activities with pushing, pulling, lifting, and/or carrying up to 20 pounds occasionally and up to 10 pounds frequently; sitting six hours in an eight hour workday; standing and/or walking two hours in an eight-hour workday; occasional climbing; balancing; stooping, kneeling, crouching, and/or crawling; frequent reaching, handling, fingering, and feeling; and no limitations in vision.

(Tr. 16, 19). Given this residual function capacity, he concluded that Kemnitz was incapable of performing her past relevant work.  (Tr. 18).

Since Kemnitz's impairments prevented her from performing her past work, the burden at the fifth step shifted to the Commissioner to determine whether there were jobs existing in significant numbers in the national economy that she was capable of performing.  (Tr. 18).  Relying upon the testimony of the vocational expert, the ALJ found that Kemnitz's functional limitations did not significantly erode her occupational base for sedentary work and there existed in the national economy a significant number of jobs that she could perform consistent with her age, education, work history, and residual functional capacity.  (Tr. 19-20).  Consequently, he concluded that Kemnitz was not disabled as defined in the Social Security Act.  (Tr. 19-20).

## II.   LEGAL DISCUSSION

### A.   Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988,  993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id.   Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion.  Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our

touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

**B.      Law governing eligibility for adult benefits**

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)      whether the claimant is presently engaged in a substantial gainful activity,

     (2)       whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

     (3)       whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

     (4)       whether the claimant has the residual functional capacity to perform his or her past relevant work, and

     (5)       if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[3] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005). Claimant's

---

    [3] In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

        While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

        The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and

subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole.  Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence.  This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner.  The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
> . . . .
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is

---

complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

    1. the claimant's daily activities;
    2. the duration, frequency and intensity of the pain;
    3. precipitating and aggravating factors;
    4. dosage, effectiveness and side effects of medication; and
    5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996). And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d at 1217.

## C.      Analysis and Discussion

### 1.      Introduction

The Commissioner makes three broad assertions in her motion for summary judgment: (1) there was substantial medical evidence in the record from acceptable medical sources to support the ALJ's decision that Kemnitz was capable of performing a full range of sedentary work; (2) the ALJ properly evaluated Kemnitz's subjective pain complaints; and (3) given Kemnitz's residual functional capacity along with the testimony of the vocational expert, the ALJ properly concluded that there were significant numbers of jobs existing in the national economy that Kemnitz was capable of performing.

Not surprisingly, Kemnitz disagrees. In her response to the Commissioner's motion, she takes the ALJ to task for what she characterizes as his over reliance on the DDS examiner's opinion, failure to properly credit the opinions of treating physicians, improper application of the Polaski factors, failure to consider her chiropractic records, inadequate hypotheticals, a propensity for

"cherry picking" only that evidence which supports his ultimate decision, and the failure to conclude that Kemnitz had a "listing-level" disability.[4]  Before turning to the arguments of the parties, it is helpful to note the following points that are <u>not</u> contested.

The ALJ concluded that the last date Kemnitz was insured for purposes of qualifying for Title II benefits was June 30, 2004.  Kemnitz does not challenge this finding, nor does she contest the conclusion that she must prove she was disabled as of that date.

The ALJ also concluded that Kemnitz was suffering from early stages of MS prior to her last day of eligibility on June 30, 2004, and that this was a severe impairment, even though the diagnosis of MS was not made until some five months later.  The Commissioner in her brief states that the ALJ

---

[4] Kemnitz also suggests that, given the initial confusion about the state of the record, she did not knowingly waive her right to representation.  However, it appears the confusion was resolved and that Kemnitz knowingly and voluntarily waived her right to representation as evidenced by the following exchange between Kemnitz and the ALJ at the outset of the administrative hearing:

ALJ:  Now you are not represented by a lawyer.  You know you have the right to be represented–

CLMT:  Yes.

ALJ:   –by a lawyer or other representative of your choice.  These people–there are people like that who exist in Bismarck who can do that for you.  These are people who know the kinds of regulations that we operate under and they know the kind of evidence we need to see.  So they can be very helpful to you.  They do not ask for money up front . . . .  They enter into a contract with you where they -- which is called a contingent fee contract usually, which means they take a certain percentage of the past due benefits that you might win if you are given a favorable decision.  So I wanted to advise you of that and give  you the opportunity to ask for a postponement if you'd like so that you might contact one or more of these people.  We have names that we can provide to you.

CLMT:   I guess I don't know.  The reason I didn't bring one today is because only I know how I feel.  I know where my pain is.  I known when my legs are numb.  I know when I can't see.  All that lawyer is going to know is what I tell him.

ALJ:   Well, that's a rather crude way of looking at it -

CLMT:    But it's true –

ALJ:     -- but that's –

CLMT:    It's true. He isn't –

ALJ:    -- still -- I

CLMT:    -- going to know unless I tell him –

ALJ:    That'll be a decision –

CLMT:     --I'm hurting.

ALJ:    --you'll have to make.  So if you want to proceed we'll do that.

CLMT:       Yea.  Let's proceed.

gave the "benefit of the doubt" to Kemnitz with respect to these conclusions, but does not appear to contest them.  However, even if did, there is substantial evidence supporting them.

The implicit conclusion of Dr. Ragland, based on the diagnosis of MS made by Dr. Benitez, is that she had been suffering from MS for some time.  And, while there might be grounds for questioning Dr. Ragland's disability assessment, there is every reason to believe that the MS did not just all of a sudden appear in the five months following the expiration of Kemnitz's eligibility for benefits.  For example, the record is replete with complaints by Kemnitz to her medical doctors and chiropractors prior to June 30, 2004, of such things as numbness and tingling in her extremities, burning pains, minor gait disturbances, and chronic fatigue - all of which are symptoms of MS according to the medical literature and consistent with the later diagnosis.[5]  (Tr. 113-116, 119, 123-124,  138-179, 195-208; See, e.g., Young v. Apfel, 221 F.3d 1065, 1067 n.3 (8th Cir. 200) (noting symptoms of MS); McCray v. Barnhart, 331 F. Supp. 2d 772, 779 n.1 (S.D.Iowa 2003) (same); see generally The Merck Manual, pp. 1474-76 (17th Ed.1999).  Further, MS is very difficult to diagnosis and can exist for years before a definitive diagnosis is possible. See id.

Finally, the ALJ concluded that Kemnitz was not capable of returning to her prior work given her impairment.  This also is not challenged by the Commissioner.  Consequently, the primary issue now is whether there is substantial evidence supporting the ALJ's RFC assessment, which, under the five-step sequential analysis, is the basis for his ultimate conclusion that Kemnitz was capable of performing at least sedentary work and was not disabled.   This point will be addressed first.

---

[5]  For example, see the following pages from the administrative record: pp.113-114, 124-125, 138-179, 195-203.

##### 2.      Lack of substantial evidence supporting the RFC determination

The ALJ concluded that Kemnitz was capable of performing a full range of sedentary work-related activities with pushing, pulling, lifting, and/or carrying up to 20 pounds occasionally and up to 10 pounds frequently; sitting six hours in an eight-hour workday; standing and/or walking two hours in an eight-hour workday; occasional climbing; balancing; stooping, kneeling, crouching, and/or crawling; frequent reaching, handling, fingering, and feeling; and no limitations in vision. He also implicitly concluded that Kemnitz was capable of doing this work on a sustained basis, *i.e.*, eight hours a day, for five days a week, or an equivalent schedule.

As noted in the recitation of the medical history, the ALJ's RFC determination is contrary to the assessment made by Dr. Ragland, who was Kemnitz's treating physician.  Dr. Ragland concluded in his February 16, 2005, assessment that Kemnitz was much more restricted in terms of what she can do and, essentially, is disabled.  The ALJ rejected Dr. Ragland's assessment, however, on credibility grounds.  For purposes of the present discussion, it will be presumed this was justified.

Although the ALJ is required to make his RFC determination based upon all of the evidence, it remains largely a medical question; hence, there must be some medical evidence supporting it. E.g., Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002); Nevland v. Apfel, 204 F.3d 853, 857-858 (8th Cir. 2000).  In this case, with the ALJ having rejected Dr. Ragland's assessment, the question then becomes whether there is other substantial medical evidence supporting his RFC determination.  And, upon reviewing the ALJ's decision with this focus, it appears he relied primarily upon two items of medical evidence: the first being the RFC assessment made by the state DDS physician in late 2003, which was before the diagnosis of MS, and the second being the

medical records of Dr. Benitez for the examinations he conducted in late November 2004 and February 2005.

The ALJ acknowledged in his decision that he placed "great weight" upon the state DDS physician's RFC assessment. However, unlike Dr. Ragland's assessment, the state DDS physician conducted no examination and his assessment was based entirely upon a review of other medical records. In the Eighth Circuit, "paper assessments" of residual functional capacity without an actual examination are admissible, but are accorded limited weight, particularly in the face of other more credible evidence. E.g., Nevland v. Apfel, 204 F.3d at 857-858; Taylor v. Chater,118 F.3d 1274, 1279 (8th Cir. 1997) (paper reviews without an actual examination are entitled to little weight); Gilliam v. Califano, 620 F.2d 691, 693 (8th Cir. 1980) (same); Landess v. Weinberger, 490 F.2d 1187, 1189-1190 (8th Cir. 1974) (same); see generally 3 Soc. Sec. Law & Prac. § 43.19.[6]  In this case, the state DDS physician's assessment is of even more limited value. There are at least two reasons why this so, even assuming  no weight should be given to Dr. Ragland's contrary assessment.

First, the state DDS physician did not have the benefit of the later diagnosis of MS. As noted earlier, MS is very difficult to diagnose and there is evidence that Kemnitz had been suffering from MS for a number of years, even though it could not be diagnosed as of the time of the 2003 assessment.[7]  Obviously, knowing that Kemnitz might have been suffering from MS would be

---

[6]  The Commissioner cites to the case of Jones ex rel. Morris v. Barnhart, 315 F.3d, 974, 978-979 (8th Cir. 2003) as providing support for the ALJ's substantial reliance upon the state DDS physician's "paper assessment." However, the Jones case is distinguishable in that the claimant in that case offered no contrary medical opinion. Further, there was nothing else in the record to cause the court to question the validity or the reliability of the assessment.

[7]  MS was noted as a possible concern in the records reviewed by the state DDS physician, but was ruled out upon an MRI. However, the reportedly negative MRI is not conclusive according to the medical literature. See National MS Society, http://www.nationalmssociety.org/brochures-on%20diagnosis.asp (last accessed October 3, 2006). Also,

important in attempting to evaluate her functional capacity, and it would be mere speculation at this point to conclude it would not have affected the assessment.

For example, the state DDS physician discounted Kemnitz's complaints of pain and other symptoms based on the lack of objective medical evidence. A number of her complaints, however, were consistent with the later diagnosis of MS as explained earlier. If the state DDS physician had considered MS in his assessment, he may have evaluated Kemnitz's subjective complaints, as well as her overall credibilty, differently.

Also, of concern is the fact that the state DDS assessment appears to have been based upon a review of only two months worth of medical records generated in May and June of 2003. The state physician may have evaluated the lack of any current symptoms during those two months differently had he considered MS. This is because the MS, given its episodic nature, might not have been active during that time frame. See The Merck Manual, pp. 1474-76 (17th Ed.1999)

Finally, if the state physician had been armed with the knowledge of MS, he might have approached his assessment differently. For example, because of the concerns already mentioned and possibly others, he might have concluded that an accurate assessment based upon a paper review was not possible and that an actual examination was necessary. He might also have recommended that Kemnitz undergo testing of her functional capacity.

There is also a second problem with the state DDS physician's assessment, apart from his lack of consideration of MS, and that is one of timing. The assessment was conducted in late 2003, but, as already noted, appears to have been based upon medical information from May and June 2003, which is slightly more than a year prior to Kemnitz's last date of eligibility for Title II

the MRI taken in 2003 may be subject to re-interpretation in light of the 2004 MRI.

25

benefits.  Since MS can often be progressive, both with respect to the  frequency of occurrence and the severity of the exacerbations, see The Merck Manual, pp. 1474-76 (17th Ed.1999), this lapse of time makes questionable the use of the assessment to determine Kemnitz's RFC as of the last date of her eligibility for benefits.

The ALJ also placed some reliance upon the examinations conducted by Dr. Benitez in December 2004 and early 2005. Neither examination, however, focused upon all of the elements required for an RFC assessment.  Notably, Dr. Benitez did not complete an RFC assessment form of the kind completed by Dr. Ragland and the state DDS physician.  More importantly, he did not express specific opinions as to Kemnitz's tolerance for handling weight, her ability to sit or stand for prolonged periods, or her ability to maintain the persistence and pace required of full-time employment.  The only specific comment he made, and upon which the ALJ placed significant reliance, was in his record of February 16, 2005.  On that occasion, after noting Kemnitz's complaints of "fatigue, muscle spasm, dizziness, imbalance, pains and aches," he stated that "her examination is quite functional."

But, it is not at all clear what Dr. Benitez intended by this comment, particularly in the context of someone having been diagnosed with MS.  Many persons who have MS are capable of working, but for others gainful employment is not possible given the debilitating nature of the disease.  In fact, when MS results in one of three conditions defined by SSA regulations, it qualifies as a *per se* disability.  See 20 C.F.R. § 404, Subpt. P, App. 1, 19.09.  Also, as already noted, there is the problem of MS's episodic nature.  A person suffering from MS may have the ability to work on some days, but not the capability of working on a sustained basis.  See generally Wilcox v. Sullivan, 917 F.2d 272 (6th Cir. 1990).

In this context, the comment by Dr. Benitez that Kemnitz was "quite functional" could mean several different things.  For example, it could mean that Kemnitz was capable of carrying out many of her normal daily activities -  "ADL's" in disability parlance.   The ability of Kemnitz to perform her ADL's, however, does not necessarily mean she has the stamina required to work full time in a competitive environment.  See e.g.,  Draper v. Barnhart, 425 F.3d 1127, 1131(8th Cir. 2005). Among other things, chronic fatigue can be a limiting a factor for person suffering from MS.  See Clark v. Barnhart, 2003 WL 1909289 (10th Cir. 2003) (remand for further consideration when the ALJ failed to adequately consider complaints of chronic fatigue by a claimant suffering from MS).

Similarly, the comment could also mean that Kemnitz was fairly functional on the day that Dr. Benitez saw her, including an ability to do some work.  But, the comment may not have been intended to  express an opinion regarding what Kemnitz's capacity would be on days that her MS may flare up or whether she would capable of working on a full time basis.

Finally, Dr. Benitez's comment might also suggest that Kemnitz was capable of functioning at the level ultimately found by the ALJ, i.e., that she could perform sedentary work in a competitive environment on a day-in-day-out basis.  However, in the absence of further guidance from Dr. Benitez and the ALJ having before him the contrary conclusion by Dr. Ragland, the determination that the latter possibility was the correct one, to the exclusion of the other possibilities, appears to be a medical judgment that goes beyond the ALJ's proper role of deciding between conflicting medical evidence.  Nevland v. Apfel, 204 F.3d at 857-858; see  Winfrey v. Chater, 92 F.3d 1017, 1022 (10th Cir.1996); Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir.1990).

In summary, the evidence relied upon by the ALJ to support his RFC determination is less than satisfying.  The paper assessment by the DDS physician is of questionable value given its

timing and the later diagnosis of MS.   Further, the examinations by Dr. Benitez do not squarely address the points critical to the ALJ's RFC determination, particularly Kemnitz's ability to engage in even sedentary work on sustained basis.   See Clark v. Barnhart, 2003 WL 1909289 (10th Cir. 2003);  McCray v. Barnhart, 331 F. Supp. 2d at 778-780.   For these reasons, there does not appear to be sufficient medical evidence supporting the ALJ's determination of Kemnitz's RFC, particularly as of the last date of her eligibility for Title II benefits.[8]

### 3.      Remand to the SSA rather than an award of benefits is warranted

Normally, remand for further determination by the agency is ordinarily the remedy in this situation.  However, when the total record convincingly establishes disability and is transparently one-sided against the Commissioner's decision, a remand for an award and computation of benefits is warranted.  E.g.,  Roberts v. Barnhart, 283 F.3d at 1067-68; Kelly v. Callahan, 133 F.3d at 590; Cline v. Sullivan, 939 F.2d at 569.   Kemnitz argues that such is the case here given the 2005 assessment made by her treating physician, Dr. Ragland.

As previously noted, Dr. Ragland concluded in his 2005 assessment that Kemnitz was not capable of performing even sedentary work on a sustained basis.  If found to be credible, Dr. Ragland's assessment would be a basis for awarding benefits, particularly given the preference normally accorded an assessment of a treating physician.

The ALJ concluded, however, that Dr. Ragland's assessment was not credible.  The ALJ determined that Dr. Ragland's assessment was based primarily upon Kemnitz's subjective

---

[8] The ALJ has the duty to develop the record fully and fairly, even when the claimant is represented by counsel, which Kemnitz was not at the time of the ALJ hearing.  E.g., Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994).   In this case, when faced with the recent diagnosis of MS,  the better course of action would have been for the ALJ to obtain a new RFC assessment, or perhaps query Dr. Benitez for a fuller explanation of his opinions, rather than place "great weight" upon the older assessment that did not consider the possibility of MS, either at the time of the assessment or later as of the last date of Kemnitz's eligibility  for benefits. See Nevland v. Apfel, 204 F.3d at 857-858.

complaints[9] and that there were reasons to discount these complaints, at least in part, based on the objective findings that were made both by Dr. Ragland and Dr. Benitez during the same time frame[10] and the ability of Kemnitz to perform a number of her ADL's.  Essentially, the ALJ concluded that Dr. Ragland was not objective and was simply acting as an advocate when he concluded Kemnitz was disabled and entitled to benefits.

As previously noted, the ALJ's evaluations of conflicting medical evidence and the credibility of opinions of examining physicians in light of other evidence are entitled to substantial deference.  Upon review of the record, it cannot be said that there is no basis for the concerns raised by the ALJ with respect to Dr. Ragland's assessment even though the court might not agree with each of the points raised by the ALJ.  Consequently, while there does not appear to be substantial evidence supporting the ALJ's RFC determination given the recent diagnosis of MS and the other points mentioned above, the medical and other evidence is not so transparently one-sided in favor

---

[9]  The objective findings noted by Dr. Ragland on February 16, 2005, do not appear to reflect any severe abnormalities and Dr. Ragland's narrative confirms this point.  Rather, it appears from his narrative that the functional limitations he imposed in his RFC assessment were based on his conversations with Kemnitz as to what she though she could do.  Essentially, Dr. Ragland found credible Kemnitz's complaints of chronic fatigue and concluded it was most probably caused by her MS.

[10]  Dr. Benitz saw Kemnitz as result of an emergency room admission on November 27, 2004, and then again in February 16, 2005.  The later examination was on the same day that Kemnitz saw Dr. Ragland for his RFC assessment.  At one point in his opinion, the ALJ also stated that the objective observations made by Dr. Ragland conflicted with those made by Dr. Benitez on the same day.  More particularly, he stated that Dr. Ragland observed certain abnormalities in her gait and in her fine motor functions in his February 2005 assessment, but Dr. Benitez found both to be normal.  However, it appears that the ALJ confused the November 2004 examination records of Dr. Benitez with the records of the February 16, 2005, examination, which is easy to do because the earlier records also have a February 22, 2005, date at the top, which clearly is not the date of the examinations, but which may be a "run date" from the computer because it appears in the "header" of the document.  What the ALJ reported was correct in terms of comparing Dr. Ragland's observations in February 2005 with Benitz's observations in November 2004.  However, when Dr. Benitez saw Kemnitz on February 16, 2005, Dr. Benitez did not record any specific observations with regard to fine motor functioning and, with respect to her gait, reported that she walked with a slight limp and that she had "give way" weakness at the level of the lower left extremity.

of Kemnitz and against the Commissioner's decision that a remand for an award of benefits would be proper.

### 4.     Other issues

Given the foregoing, it is not necessary to address all of the other issues that have been raised by the parties.  However, several are worth considering in view of the possibility of remand.

### a.     Problems with the hypothetical questions posed to the VE

"It is well established that questions posed to a vocational expert should precisely set out the claimant's particular physical and mental impairments." Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994) (internal citations and quotations omitted).  The rationale for this requirement is that "[u]nless the hypothetical question comprehensively describes the limitations on a claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant." Id. Thus, "[i]f a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability."  Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (citing Green v. Sullivan, 923 F.2d 99, 101 (8th Cir. 1991)); see also House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994) (stating that a proper hypothetical question "is sufficient if it sets forth the impairments which are accepted as true by the ALJ.").

In this case, the hypothetical questions posed to the VE were somewhat confusing.[11]  After

_____

[11]	The ALJ framed the hypothetical as follows:

	Q	Let's assume -- let me give you a hypothetical that might be able to help you a little bit -- get started here, Mr. Haagenson. If we have a woman of this Claimant's age, which
* * *
	Q	She's 48 now, with a 12th-grade education and the past work experience that's reflected in your past relevant work summary. She has a history of complaining about back and leg problems and balance problems and an optic neuritis with an acute phase several years ago, which seems to have resolved, with weakness and fatigue and a feeling of numbness in certain parts of her body. A most recent diagnosis of -- there were -- a provisional diagnosis of MS by this Dr. Benitez in November of 2004. She was complaining of having difficulty seeing out of her right -- was the main presentation. But he now since then in February of 2005 continues to refer to her diagnosis of multiple sclerosis. He saw some small -- in the viewing of the brain, he saw some small -- I'm trying to find it here so I refer to it correctly. With regard to the MRI of the brain, it showed small ischemic demyelinating lesions in the subcortical white matter of both cerebral hemispheres. He refers to this as -- he's referring to her multiple sclerosis as -- how does he refer to it? Stable MS with –
	CLMT:	Relapsing.
	ALJ:	-- multiple -- what?
	CLMT:	Relapsing remitting MS.
	ALJ:	All right. I'm just telling the --
	CLMT:	Oh, okay.
	ALJ:	-- Mr. Haagenson the way your doctor phrases it. Stable multiple sclerosis with multiple complaints of fatigue, muscle spasms, dizziness, imbalance, pains and aches. But he does say that her examination is quite functional. She does have some giveaway weakness in the left lower extremity and discomfort in that leg. She's described for us a foot -- a small foot drop, which no doubt she has. She describes feeling slightly fatigued, pain in the left foot, some back pain, and the doctor did quite a long study -- quite a long evaluation of her with the many physical -- many parts of a physical clinical evaluation in November 2004. There was no evidence of decreased attention or no significant mental problems that he found. Her visual fields -- no significant problems in her visual fields. In her motor examination, no evidence of focal weakness, atrophy or vesiculations. Muscle strength was 5/5. No abnormal spontaneous movements, such as myoclonus, resting tremors or tics. This -- he does mention the slightly increased deep tendon reflexes. No significant spasticity. Intact sensory examination, intact to pinprick, vibration, et cetera. A normal base for her gait and stride. The arm swing was present and symmetrical. She was able to walk on her heels, toes, and tandem-walk without any problems. With regard to her coordination and cerebellar examination, her fingertips, hand grips, hand pronation, supination and rapid alternating movements in the upper and lower extremities were all normal. The musculoskeletal examination reviewed normal spinal range of motion, and so on and so forth. "She seems to be affected," he says "by MS at the present moment." The evolution of her symptoms with intermittent trench [phonetic] and deficits has had those -- may have in the past pointed at transverse myelitis, but more probably he's saying MS now. So that's generally what's been found. We have Dr. Ragland's notes and he did fill out a medical source statement giving her less than ten pounds lifting and less than an two hours of an eight-hour walk [sic] day of standing and/or walking, but he explains this as -- in pointing to her subjective -- the subjective things that she's said to him. He did not find any neurodiagnostic abnormalities. She may have some musculoskeletal ligamentous-type problem in the lower back. He just refers to that. So that generally is what we have here. I -- certainly her lifting ability will have been somewhat compromised due to this problem and her balance problems mainly. Let's assume a narrow range of light work and that perhaps can lift on an occasional basis up to 20 pounds, but probably limited to standing for two hours each day during an eight-hour workday. She has -she notes this discomfort and these various symptoms that I've described probably on a fairly chronic basis. They're probably noticeable to her very frequently if not

reciting some of the medical evidence, the ALJ suggested Kemnitz was capable of performing a "narrow range" of light work and then listed several limitations.   This conflicted, to some extent, with the ALJ's written decision in which he concluded that Kemnitz was capable of performing a "full range" of sedentary work.  Also, as the Commissioner conceded in a footnote to her brief, the ALJ's hypotheticals did not expressly include all of the physical limitations found by the ALJ in his RFC determination.

More particularly, the hypotheticals did not reference the restriction that frequent weight lifting was limited to ten pounds (but, perhaps, this may have been implied from the restriction that Kemnitz could lift up to twenty pounds occasionally), the limitation of "occasional climbing, balancing, stooping, kneeling, crouching, and/or crawling," or the limitation of sitting six hours in an eight-hour work day.   On the other hand, the ALJ stated that Kemnitz was capable of carrying out work assignments consistent with the exertion level that he described, which he stated was standing no more than two hours and the ability to lift occasionally up to twenty pounds.  He also stated that Kemnitz could remain attentive and responsive, except for having to change her position from time-to-time.

The Commissioner suggests that the somewhat confusing hypotheticals are not fatal, because the vocational expert considered only sedentary jobs given what he understood to be the limitations

at all times, but assume for the moment she would be able to remain attentive and responsive in a work setting and could carry out normal work assignments at this appropriate exertional level that I've described. She might find it necessary to change position from time to time to relieve these -- this symptomatology. MS is always a difficult problem. There are different phases of it – of the disease and different and varying types of the disease. But let' assume that what I've said to you is a fairly accurate summary of her residual functional capacity.
BY ADMINISTRATIVE LAW JUDGE:
     Q   Would there by any jobs in the national economy she could perform?
     A   And to assume that the sitting is – the only restriction on sitting is that there would be a need to be occasional changing of position?
     Q   Yes.
(Tr. 252-255).

imposed by the ALJ that she stay off her feet for the majority of the working day and that she be allowed to change her positions.  As to this point, the Commissioner is probably correct.  It does appear that the VE  understood the essence of the limitations imposed by the ALJ and that the jobs he found to exist in requisite numbers matched those limitations.  But, if this matter is remanded, additional VE testimony may be required depending upon the outcome of a new RFC determination.  Also, the Commissioner can eliminate the problem of another court deeming the hypotheticals to be inadequate by obtaining additional VE testimony.[12]

### b.      The ALJ's consideration of Kemnitz's credibilty

Kemnitz contends that the ALJ did not properly apply the Polaski factors when assessing her credibility. She takes particular exception to his interpretation of her testimony regarding her daily activities and to what she perceives to be a failure to consider her chiropractic records.

The ALJ considered Kemnitz's ability  to clean her house, do laundry, wash dishes, cook, use the computer to email, and read as an indication of her ability to "bend, stoop, crouch, lift, use her vision, and balance.  He pointed to the fact that she was able to go on a driving vacation with her husband in the summer of 2004.  He noted that she remained capable of driving a car had driven to the hearing. Also, he had the opportunity to observe her in person at the hearing.  While none of this evidence is dispositive in terms of disability, these are things the ALJ can properly consider in assessing Kemnitz's credibility and making his RFC assessment.[13]

---

[12]  In fairness to the ALJ, he undoubtedly prepared for the hearing based on the medical records that he had been provided, and it was not until the hearing that he received the additional records of Dr. Benitez containing the affirmative diagnosis of MS.  Kemnitz had earlier advised the agency of the existence of the records, but for some reason the agency failed to collect them.  This appears to have contributed to the confusion in terms of the hypotheticals that were asked.

[13]  The Commissioner in her brief also points to several statements made by Kemnitz at the hearing before the ALJ as further reason for discounting her complaints of functional limitations and her claimed inability to perform sedentary work.  After the VE testified and indicated that he believed Kemnitz could perform sedentary work, such as

On the other hand, there are certain aspects of the ALJ's discussion of the Polaski factors that raise questions and that the ALJ may want to more specifically address if this matter is remanded. One is his reliance upon Kemnitz's history of taking pain medication. At one point in his decision, he stated that Kemnitz had not required any "prescription pain medication during the entire time period in question," but at other places noted she had been prescribed certain prescription analgesics for pain. Also, there is some suggestion in the record that the prescription medications were discontinued in favor of her continuing to take ibuprofen as needed because of her intolerance of the prescription medications and not because she did not periodically have pain.[14] It is probably because of these inconsistencies that the Commissioner notes in her brief that Kemnitz was never prescribed any "narcotic" pain medication, which is true, but which is of questionable significance in the

---

fielding phone calls, Kemnitz made statements to the effect that it would be difficult for her to find jobs like that where she lived and that she was not going to drive to Bismarck to work. The Commissioner suggests that these statements amount to an acknowledgment on her part that she could the work. While it may be possible to view the statements in that light, the statements may also simply reflect exasperation on her part with the process. Further, she never directly stated she could perform the work, much less do it day-in-and-day-out on a full time basis.

The ALJ had the benefit of considering these statements in light of her demeanor, the atmosphere at the hearing, and other like factors and chose not to rely upon them in discounting Kemnitz's credibility or in determining her functional capabilities. The undersigned is reluctant to attach to these statements the significance suggested by the Commissioner based on the cold record when the ALJ did not do so.

[14]   Beginning in 2003 when she Kemnitz first saw a neurologist after several years of treating with chiropractors, Dr. Niaz started Kemnitz on Bextra, which is a prescription analgesic prescribed for pain. (Tr. 116) See WebMD, http://www.webmd.com/drugs (last accessed September 27, 2006). In a follow up visit in 2003, Dr. Niaz reported that Kemnitz was taking ibuprofen as needed but that she stopped taking the Bextra because it made her itch. He then prescribed Ultracet, which is also prescription analgesic prescribed for pain. (Tr. 113) See id. Still later in 2003, when she first saw Dr. Ragland, he decided, without any detailed explanation at that time, not to prescribe pain mediation. However, later in the records of Dr. Ragland's 2004 examination, he stated he would treat Kemnitz with anti-inflammatory medications, except that she has gastritis and noted this was a "big handicap." (Tr. 196). Later, after she was diagnosed with MS, Dr. Benitez in his November 27, 2004 and February 16, 2005, examination records note that Kemnitz had been taking ibuprofen for pain as needed. (Tr. 215 & 226). And, as a result of the February 2005 examination, he prescribed Baclofen for her MS. According to WebMD:

> Baclofen is used to treat muscle tightness and cramping (spasms) caused by certain conditions such as multiple sclerosis and spinal cord injury/disease. It works by relaxing the muscles. Decreasing spasms helps reduce pain and stiffness, improves your ability to move around, and lets you do more of your daily activities.

See id. In fact, Dr. Benitz in his record stated that she might consider taking the Baclofen right before she went to bed because "the pain is only worse at night." While the Baclofen was prescribed after Kemnitz's last date for eligibility, it may have been prescribed prior to that date had the diagnosis of MS been made.

absence of information indicating that strong pain medication is part of a normal regime for treating MS.

Likewise, the ALJ noted that Kemnitz had not required any ongoing treatment during the entire period in question. While this may be true if only the medical treatment is considered, it does not appear to accurately reflect the record when the chiropractic records are considered. It appears that Kemnitz sought treatment and/or evaluations for ongoing symptoms rather consistently throughout the entire period from either medical care providers or chiropractors. And, Dr. Ragland recommended in 2003 that she continue with her chiropractic treatment. Further, whether medical treatment is required of someone suffering from MS may also be subject to question.

Also, it is a bit unclear from the ALJ's opinion what weight he accorded the chiropractic records. The ALJ correctly points out that, under SSA's regulations, chiropractic records are not acceptable medical sources for the purposes of establishing an impairment. See 20 C.F.R. § 404.1513(a). But, this does not mean that chiropractic records have no evidentiary value. They can be used, for example, to show how a proven impairment affects a claimant's ability to work and can also be used in addressing other issues relating to the overall determination of disability. See 20 C.F.R. § 404.1513; SSR 06-03p.

If the matter is remanded for a new RFC determination based upon substantial evidence, the ALJ may want to consider re-evaluating the evidence with regard to the Polaski factors in light of the foregoing and any new RFC determination. Further, the ALJ may also want to consider discussing more specifically the credibility of any complaints of chronic fatigue that may be caused by the MS and the impact that any credible complaints may have on her ability to maintain full time employment.

**III.     CONCLUSION AND RECOMMENDATION**

Based on the foregoing, it is hereby **RECOMMENDED** that the Commissioner's motion for summary judgment (Docket No. 7) be denied and that this matter be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further development of the record in accordance with this report and recommendation, including particularly a new RFC determination based on substantial medical evidence.  See Buckner v. Apfel, 213 F.3d 1006, 1011(8th Cir. 2000) (holding orders that do not expressly affirm, modify, or reverse a decision of the Commissioner but rather direct her to cure some specific defect in the administrative proceedings are sentence four remands).

**NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation.

Dated this 6th day of October, 2006.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge
